Elnora C. WILLIAMS

v.

Earl HOFFMEISTER, in his official capacity as the Superintendent of the Knox County Schools; Fred Bedelle, Jr., in his official capacity as an Administrative Assistant in the Knox County Schools; Vernon Anderson, Kathleen Benson, Daniel Cooper, John Cox, W. B. Housley, A. L. Lotts, and Jack Nichols, in their official capacities as members of the Knox County Board of Education and the Board of Education of Knox County, Tennessee.

Civ. No. 3–80–538.

United States District Court,

E. D. Tennessee, N. D.

June 23, 1981.

Charles Hampton White, William Prentice Cooper, Nashville, Tenn., for plaintiff.

Dale Workman, Charles A. Maner, Jr., Knoxville, Tenn., for defendants.

## OPINION AS RENDERED FROM THE BENCH

ROBERT L. TAYLOR, District Judge.

Plaintiff sues Earl Hoffmeister, the Knox County School Superintendent, Fred Bedelle, Jr., Hoffmeister's Administrative Assistant, and the Members of the Knox County School Board claiming that she was refused promotions on account of her race and sex. The United States Magistrate, sitting as a Master, found that plaintiff had been discriminated against on account of her sex, but not on account of her race. The Master recommended that plaintiff be appointed promptly to a position of principal, assistant principal or supervisor for

which she is qualified within the school system with appropriate benefits, seniority and tenure status which such appointment would have afforded her had she been continuously employed from July 11, 1979. The Master denied plaintiff's claim for back pay because she could not prove the amount with any degree of certainty and because she could have mitigated her back pay damages by accepting the assistant principalship at Doyle Middle School when Dr. Bedelle offered it to her in July, 1980. The Master treated plaintiff's case under Title VII, 42 U.S.C. §§ 2000e–2(a), (k) and not under 42 U.S.C. §§ 1981, 1983, although plaintiff sought relief under both.

Specifically, the Master found that defendants intentionally discriminated against plaintiff on account of her sex in connection with the July, 1979 vacancy in the assistant principalship at Halls Middle School, the August, 1979 vacancy in the assistant principalship at Karns Middle School and the August, 1980 vacancy in the principalship at Cedar Bluff Intermediate School. The principal grounds for the findings of the Master are: remarks (which were not contradicted) by Mr. Hoffmeister and Dr. Bedelle that they favored men for certain jobs; plaintiff's qualifications as compared to the qualifications of the individuals selected for the positions; the reasons given by defendants as to why plaintiff was not appointed are, in some instances, suspect as, for example, defendants said they did not consider plaintiff for disciplinarian positions prior to July, 1980 because plaintiff had expressed her desire not to have such a job when, in fact, she did not give them this information until July, 1980; and the fact that there have been no female middle school principals during the past five years.

Defendants have objected to the Special Master's Report and assert that since 1977 females have received 80% of the promotional appointments from the teaching level to administrative and supervisory jobs. Defendants argue that plaintiff was not as well qualified as the individuals who were appointed to the jobs with respect to which the Master found discrimination.

Plaintiff objects to the denial of back pay by the Master and contends that back pay must be awarded to make her whole. Plaintiff says that under the Sixth Circuit law that back pay should be awarded if it can be shown "within the realm of reasonable probability." *Meadows v. Ford Motor Co.*, 510 F.2d 939 (6th Cir. 1975). Plaintiff relies also on a Fourth Circuit case, *E.E. O.C. v. Ford Motor Co.*, 645 F.2d 183 (4th Cir. 1981), which has been cited and explained by counsel for the plaintiff during the argument, and on *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), a case of the Supreme Court of the United States, which was likewise cited by counsel for the plaintiff.

The Court has tried to find a way to make all people whole in this litigation, including the plaintiff, and in that connection asked counsel for defendants during the argument if it would be necessary to put someone out of a job in order to place plaintiff in a position recommended by the Master. The Court was disappointed to find that plaintiff could not be placed in a principalship without eliminating some person who presently holds an administrative or supervisory position.

Before making a final decision in the case, the Court will take the case under advisement, as the Court had hoped the matter could be worked out during the argument this morning but finds that it is not possible.

## SUPPLEMENTAL MEMORANDUM

At the conclusion of the hearing on June 22, 1981, the Court made certain findings and at the conclusion of those findings stated that the matter would be taken under advisement for further consideration.

At the outset, the Court reaffirms its position that judges should not undertake to run the schools or to meddle in school matters unless it is absolutely necessary. This case has given the Court more than ordinary concern since the Court has had considerable experience with Dr. Bedelle, who testified in some of the school cases in the past. These cases were hotly contested

and required appeals and in some instances more than one time. In those cases, Dr. Bedelle's testimony was relied upon by the Court to a large extent in making its findings and conclusions. Dr. Bedelle has testified in this case and recommended the appointments now contested by plaintiff. This Court hesitates to put its opinion above that of experienced school administrators. However, the Master has made findings which, under the law, are binding upon the Court unless clearly erroneous. The Court has carefully read and studied the transcript, exhibits and briefs in this case. After this meticulous review, we cannot say that the findings of the Master are clearly erroneous or that his conclusions are not supported by the law. Therefore, the Court, with considerable hesitation, is constrained to approve the findings and conclusions in favor of the plaintiff, and also the findings and conclusions in favor of the defendants on the question of back pay.

For these reasons, it is ORDERED that the School Board place plaintiff in a position of principal, assistant principal or supervisor for which she is qualified within a reasonable time and not later than the 1982–83 school year. At the time she is given this position, she will be given the appropriate benefits, seniority and tenure status which such appointment would have afforded her had she been continuously employed from July 11, 1979.

This case is rereferred to Robert P. Murrian, United States Magistrate, to determine whether or not plaintiff is entitled to any attorney fees; if so, the amount.

Order Accordingly.

## SPECIAL MASTER'S REPORT

### ROBERT P. MURRIAN, Magistrate.

This is a civil rights action brought pursuant to 42 U.S.C. § 2000e–2(a) and (k) and 42 U.S.C. §§ 1981 and 1983 [1] to redress discrimination in employment which the defendants allegedly practiced against the plaintiff because of her sex and race.

The plaintiff Elnora C. Williams, is a black, female, tenured classroom teacher employed by the Board of Education of Knox County, Tennessee. She contends that the defendants, the Knox County Board of Education, Superintendent Earl F.

---

1. Section 2000e–2(a) provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applications for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as as employee, because of such individual's race, color, religion, sex, or national origin.

Section 2000e–2(k) provides:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–

2(h) of this title shall be interpreted to permit otherwise.

The plaintiff filed an original complaint with the Equal Employment Opportunity Commission on August 17, 1979 and received a "right-to-sue" letter on October 2, 1980.

Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Hoffmeister and his Administrative Assistant, Dr. Fred Bedelle, have unlawfully refused promotions and employment opportunities to her within the Knox County school system. This case was referred to the undersigned for trial pursuant to 28 U.S.C. § 636(b)(2) and Rule 53, Federal Rules of Civil Procedure. The case was tried on March 17 and 18, 1981, and the parties have submitted posttrial proposed findings of fact and conclusions of law. A complete transcript of the trial was filed April 10, 1981.

## I. *Findings of Fact*

1. The Board of Education of Knox County, Tennessee (hereinafter referred to as the "Board of Education"), is organized and exists under the laws of the State of Tennessee, and is charged by these laws with the operation and administration of the public schools of Knox County. The Board of Education is also an employer in a business, activity or industry affecting commerce and has fifteen or more employees for each working day in each of twenty or more calendar weeks in a calendar year. Vernon Anderson, Kathleen Benson, Daniel Cooper, John Cox, W. B. Housley, A. L. Lotts and Jack Nichols are sued in their official capacities as the duly elected, qualified and acting members of the Board of Education during the periods of time which are pertinent to this case.[2]

2. Mr. Hoffmeister is the Superintendent of the Knox County school system (school system), a publicly financed operation comprising 46 schools educating the children who reside in Knox County, Tennessee. Pursuant to the Private Acts of Tennessee of 1943 and 1945, individuals employed by the school system may hold tenure in the system under separate classifications affording tenure to teachers and principals separately. In default of a specific provision within the Private Acts of Tennessee, Mr. Hoffmeister is charged, pursuant to T.C.A. § 49–224(10) and (12), with the duties of recommending teachers to the

Board of Education for employment within the school system, and of assigning teachers to positions within the schools pending the meeting and approval of the Board of Education. Pursuant to Section 3 of Chapter 345 of the Private Acts of Tennessee of 1945, Mr. Hoffmeister is one of the individuals who is entitled to prefer charges against an employee of the schools. *See* Collective Ex. 36. Although Mr. Hoffmeister has served as the Superintendent of the school system since 1976, he has been employed in the field of public education for a number of years.

3. Dr. Joseph Chandler was an assistant to Dr. Bedelle regarding personnel matters. Tr. 169. Superintendent Hoffmeister was elected in 1976 and Dr. Bedelle has worked as his chief assistant for most of that time. Dr. Bedelle played a significant role in assisting Superintendent Hoffmeister in formulating recommendations for personnel transfers, promotions, etc. that were ultimately made by Superintendent Hoffmeister to the Board of Education. Pursuant to a resolution of the Board of Education dated June 11, 1980, Dr. Bedelle is the administrator charged with the duty of formulating and implementing a plan of action to be taken by the defendants affirmatively to ensure nondiscrimination in employment in the school system. In January, 1981, such a plan was implemented. Ex. 28. Pursuant to the procedures established for making his own recommendations on personnel matters to the Superintendent, Dr. Bedelle received, read and evaluated reports submitted to him with respect to the performance of principals and assistant principals within the school system. Bob Goff and LaNoka O. Rhodes, each a supervisor of the Knox County schools, were the individuals who drafted and submitted these reports to Dr. Bedelle for the middle and elementary schools of the school system, respectively.

4. Mrs. Williams received a B.S. degree in August, 1968, from Florida Memorial College in Miami, Florida, based upon a

---

2. Wayne S. Cannon and Mickey Jeffries are members of the Board of Education but have been dismissed from this case.

course of studies in elementary education. In March, 1977, she received a M.S. degree from the University of Tennessee in Knoxville, Tennessee, based upon a course of studies in educational instruction and curricula. She is also trained in administration and supervision. Tr. 22. During the interval of time which is pertinent to this case, she was, and is now, enrolled in a program at the University of Tennessee which leads to the conferral of the advanced degree of Doctor of Education. In 1977 she was certified by the Department of Education of the State of Tennessee as qualified as an elementary or middle school principal, supervisor or other administrator in the Knox County schools.

5. The Board of Education employed her as a classroom teacher for the years 1972 through June 1977. She had four years of classroom teaching experience prior to 1972 in schools in Florida and Alabama. Her teaching experience includes grades 1 through 5. As a result of her service in the Knox County school system, she held tenure as a classroom teacher pursuant to Chapter 345 of the Private Acts of Tennessee of 1945.

6. In the Spring of 1977, Dr. Chandler approached the plaintiff and asked her if she would be interested in an administrative position after she was properly certified. She replied in the affirmative and submitted an application. In July, 1977, the Board of Education accepted Mr. Hoffmeister's recommendation, and she was appointed principal at John Sevier Elementary School for the 1977–78 school year. She was advised that John Sevier would be consolidated with two other schools to form a new elementary school (East Knox County Elementary School) at the close of the 1979 school year, and she therefore knew that her tenure at John Sevier could be for no more than two years. She also was advised at this time that a white female principal, Wanda Johnston, employed at one of the other elementary schools to be closed as a

result of the consolidation, would be recommended to be the principal of the new East Knox County Elementary School.

7. The plaintiff met with Mr. Hoffmeister in July, 1977, and he told her: "I am happy to see you in this position. But we like to promote our men in these type positions because a lot of times women will ask for a promotion." Tr. 28–29. Mr. Hoffmeister has not denied that he made this remark.

8. The plaintiff was thus appointed to an administrative position just a few weeks after receiving the proper certification. Dr. Bedelle explained that appointing Mrs. Williams to the principalship at John Sevier and a white, female teacher, Sandra Hamilton, to a principalship at another elementary school which was also to be closed in two years, gave the administration the opportunity to "look at" them as administrators. Such appointments, he said, would minimize the disruption to the system since it was for a definite two-year term. Tr. 370–371.[3]

9. At a meeting held before school opened in September, 1977, the plaintiff raised a question about the prospective appointment of Mrs. Johnston to the position of principal at the new East Knox County Elementary School. Tr. 31–32. Some type of conflict arose between Mrs. Johnston and the plaintiff. Beecher E. Clapp, the Director of Curriculum and Instruction for the school system, investigated the problem, discussed it with the plaintiff and reported favorably on the results of his investigation and interview with the plaintiff. *See* Ex. 1.

10. On April 13, 1978, Ms. Rhodes completed a written report evaluating the plaintiff as principal of the John Sevier Elementary School for the 1977–78 school year. Ex. 2. The report stated *inter alia* as follows:

Elnora has done an *outstanding* job of determining and writing appropriate job targets for her first year. In addition,

---

3. Presumably, he meant that neither of the women would be tenured principals when the schools closed and they could therefore be reassigned as classroom teachers if that were deemed advisable. In order to be tenured, an assistant principal or principal must be appointed for a third school year. Tr. 250.

her implementation of those targets as indicated is complete and extremely well written.

\* \* \* \* \* \*

... She has done everything anyone could ever ask to bring the staff together into a working whole. In addition, she has made remarkable progress in community involvement.... The community sees her as a truly dedicated principal who is concerned for the needs of John Sevier School.

*Id.* (emphasis in original). Ms. Rhodes evaluated the plaintiff monthly and was in as good a position as anyone to know just how effective she was as a principal.

11. Mr. Hoffmeister recommended the plaintiff to the Board of Education for reappointment to the principalship at John Sevier for the 1978–79 school year. He did so some time after an incident occurred at the school concerning a violation of school system policy prohibiting the leaving of money in the school overnight. The plaintiff was warned about violating this policy and advised that she used poor judgment in accusing a clerk of stealing the money. Notwithstanding this incident, she was reappointed.

12. There was really no dispute at trial that the plaintiff performed successfully as principal at John Sevier. On May 7, 1979, LaNoka O. Rhodes completed a written report evaluating Ms. Williams as a principal in the 1978–79 school year. Ms. Rhodes states in the report that

Elnora has completed all the job targets set for the 1978–79 school year.

\* \* \* \* \* \*

Elnora has enjoyed much success at John Sevier with instructional improvement. The school program has improved tremendously during her tenure there. She has worked extremely well with the community and is greatly appreciated by the John Sevier parents.

Ex. 6. In her report, Ms. Rhodes recommended to officials of the Knox County schools that they should transfer the plaintiff into another administrative position within the school system.

13. The plaintiff had written Dr. Bedelle a letter in February 1979 advising him that she was interested in being considered for any supervisory or administrative position within the school system. Ex. 3.[4]

14. No direct response was made to the letter. Although the school system's written policy is to the effect that personnel are to be notified of vacancies that occur, *see* Ex. 13, § 4005.06, the plaintiff often discovered promotional opportunities unofficially through "the grapevine." Tr. 123. Often there was no official notification of vacancies for which the plaintiff was qualified. Tr. 270–271.

15. In May, 1979, the plaintiff received a telephone call from Dr. Chandler in which he advised her that she was being reassigned as a classroom teacher at Powell Elementary School. Tr. 47–48. She called Dr. Bedelle's office that same day but he was not available. She did, however, discuss the matter with Mr. Hoffmeister over the telephone. He told her that the order sending her back to the classroom would be rescinded. *Id.* However, Dr. Bedelle called her back that same day and told her that she was being reassigned as a classroom teacher "to protect [her] tenure rights" and that he could not foresee her being in an administrative position in the future. *Id.* She remained a classroom teacher at Powell Elementary School at the time of trial.

16. By letter dated June 4, 1979, the plaintiff advised Mr. Hoffmeister that she was interested in being appointed to the post of principal at the new East Knox County Elementary School. Ex. 7. The opening occurred because Mrs. Johnston had resigned from the school system for personal reasons.

17. Several parents from John Sevier visited Mr. Hoffmeister at his office on

---

**4.** As an elementary school principal, the only way that the plaintiff could be "promoted" and stay in the area of administration and supervi-

sion was if she were appointed to a larger school. Tr. 367. Middle schools are normally larger than their "feeder" elementary schools.

June 7, 1979. They asked that the plaintiff be appointed as principal at East Knox County Elementary School. Mr. Hoffmeister told them that the plaintiff did not have sufficient experience to handle the 900 to 1000 students in grades K through 8 who would be attending the new school. Tr. 162, 408. One of the parents asked Mr. Hoffmeister if the plaintiff did not get the job because she was black and female. He replied in the negative. Tr. 162. The plaintiff's pregnancy was mentioned, but it is not clear what views, if any, Mr. Hoffmeister expressed to the parents concerning the plaintiff's ability to carry out the job because of her pregnancy. Tr. 162, 163.[5]

18. The plaintiff points specifically to several statements made to her by Mr. Hoffmeister at a July 2, 1979 meeting as evidencing impermissible sex discrimination on his part. No one else was present at the meeting. Mr. Hoffmeister has not denied that he made the statements. He told the plaintiff that " . . . women tend to work harder, but occasionally some schools would benefit from having a male administrator." Ex. 8 at p. 2. He also told the plaintiff that " . . . a lot of times you just need a man . . ." as an administrator because " . . . children need a male image." Tr. 60.

19. Statistically, the few blacks that have been involved in personnel actions at the administrative level during Mr. Hoffmeister's tenure have fared rather well. During the time period in question herein, the school system had only four employees who were black and who had the proper certification to qualify them for employment in an administrative position. Mr. James Robinson, a black male, has been serving since prior to 1976 as the Director of Federal Projects, an administrative and supervisory position in the school system. Ms. Delores McSwine was appointed Title I Reading Coordinator on August 13, 1980, an administrative position. Ms. McSwine is a black female. Mrs. Williams, of course,

obtained her certification in March, 1977, and during the next school years 1977–78 and 1978–79 served as a principal. One other black female employee has certification qualifying her for an elementary principalship or supervisory position and she has applied for such positions along with 40 or 50 white males and females. Fifty percent (50%) of the black qualified employees in the school system hold administrative or supervisory positions at this time. Seventy-five percent (75%) of the black qualified employees held administrative, supervisory or principalship positions during the years of 1977–78 and 1978–79. The defendants have made some effort to recruit minorities for positions within the school system. During the 1979–80 school year there were no black applicants from outside the school system who were seeking administrative positions. Tr. 296. Dr. Bedelle testified that about two blacks had applied for administrative positions from outside the school system during his entire tenure as administrative assistant to the superintendent. Tr. 296. During the period of time in question, black females constituted only 1.2% of the full-time teaching employees of the school system.

20. On the other hand, Mr. Hoffmeister's remark about children sometimes needing a "male image" is consistent with the evidence that no female has served as the principal of a middle school within the school system during the entire period of time pertinent to this case. Tr. 455. There was one female co-principal at the secondary level during that same period of time.[6] Female principals are almost exclusively assigned to elementary schools. On December 15, 1976, there were 54 principals in the school system, of which 16 were females. There were 14 assistant principals, of which 4 were females. Ex. 16. In May, 1979, there were 48 principals in the school system, of which 9 were females. There were 18 assistant principals, of which 5 were females. Ex. 17.

---

5. Mrs. Williams delivered twins on July 13, 1979.

6. Ms. Leola Hodge served as co-principal with a male at Powell High School until she was

appointed to the position of Supervisor of Guidance and Health Education on July 11, 1979. Tr. 394; Ex. 20.

21. Data from the Tennessee Department of Employment Security indicate that 3210 of the 3980 elementary and secondary teachers employed in the Standard Metropolitan Statistical Area for Knoxville, Tennessee, are female. Ex. 15.[7] This amounts to a percentage of 80.6%. The defendants' own records show that in May, 1979, there were 966 female elementary and secondary classroom teachers and 302 male elementary and secondary classroom teachers. Ex. 17. Thus, females comprised 76% of the classroom teachers at that time. The Board of Education's written policy provides that promotions from within the school system are preferred. Ex. 13, § 4005.06.

At all times material to this case, there were about 40 to 50 qualified, appropriately credentialed individuals within the school system seeking appointments to all levels of administrative jobs. Tr. 294–295.[8] During the 1979–80 school year there were applications from 36 qualified persons not employed by the school system for such positions, and 18 of these applications were from females. Tr. 295–296.

22. On July 11, 1979, the Board of Education approved Superintendent Hoffmeister's recommendation that David E. Wetzel be appointed as principal of the new East Knox County Elementary School. The plaintiff claims that she was discriminated against in connection with this appointment.

In the area that the new school was to serve, there was an identified need for remedial instruction in the area of reading. Tr. 410. Mr. Wetzel had been the supervisor of reading in the school system for five years prior to his appointment to the new job. Tr. 411. Although he would not be directly involved in teaching reading, he would be involved in monitoring the classroom instruction in reading, supervising and helping his teaching staff and locating problem areas. Id. Mrs. Williams was told in 1979 at a meeting with Mr. Hoffmeister, Dr. Bedelle and Mr. Clapp that she would not get the job because inter alia Mr. Wetzel had particular expertise in reading. Tr. 80. Mr. Wetzel was an experienced, tenured principal and the incident involving his absence from the school building while at Carter High School did not affect his ability or competence to fill the position at the new elementary school. See Ex. 24; Tr. 205, 406, 408.[9] One of the plaintiff's witnesses described his performance at East Knox County Elementary School as "fantastic." Tr. 166.

The plaintiff also contends that she was not appointed to the position because she was pregnant. The defendants did not deny that her pregnancy was a consideration.

East Knox County Elementary School was a large, brand new school in 1979. The defendants had a legitimate interest in ensuring that its new principal would be physically present in August when arrangements were made to open the school in September and to be present when the school actually opened. See Tr. 82, 137, 225–226, 414–415.

After the birth of her twins on July 13, 1979, the plaintiff took maternity leave from August 23, 1979 to October 4, 1979. Ex. 10.

The defendants had on at least one occasion granted a principal sick leave at the beginning of a school term and had placed a teacher in the position temporarily. They had also provided the teacher with additional administrative help when the school opened. This instance involved an on-going school, however. There was no evidence that these arrangements had ever been made for a new principal assigned the task of opening a new school.

7. This is based on 1970 Census Data. This was the most recent data available at the time of trial.

8. It is not clear from the record how many of these persons were female. There is evidence in the record, however, that many women apply for such promotions. Tr. 28–29.

9. Mr. Hoffmeister reprimanded Mr. Wetzel in February, 1978 for being absent from the school on several occasions without notifying the Superintendent's office. Mr. Hoffmeister testified that as far as he knew the reprimand was effective.

The preponderance of the evidence showed that the defendants treated the plaintiff on equal footing with any other applicant for the job who was less qualified in the area of reading instruction than the person appointed and who might have had a temporary (or potential temporary) disability at the beginning of the school year at a new school.

23. The plaintiff was also rejected with respect to a number of other administrative positions for which she was qualified after the date of her rejection for the job at East Knox County Elementary School. She contends that she established a prima facie case with respect to the vacancies or opportunities filled by the following males: Bill Thomas, Lewis P. Robinette, James Ray Ross, D. James Monroe, Ron Thomas, Paul Williams, and Fred W. Nidiffer, Jr.

24. Bill Thomas was transferred by the Board of Education on July 11, 1979 from his position of principal at Karns Middle School to principal of Sunnyview Elementary School. Ex. 20. Sunnyview housed grades K through 8 and was attended by about 600 students. Tr. 392. Mr. Thomas had taught the 7th and 8th grades and, unlike the plaintiff, he was a tenured principal, Tr. 391–392. A problem arose in the Karns community regarding Mr. Thomas' relationship with the parents, although his ability as an administrator was never questioned. Tr. 331, 391. Dr. Bedelle testified that the community relations problems at Karns Middle School precipitated the transfer of Mr. Thomas. Tr. 393. Mr. Thomas was considerably more experienced as a principal than the plaintiff. Tr. 394.

25. Lewis P. Robinette was transferred on July 11, 1979 from his position as assistant principal at Doyle High School to principal at Bonny Kate Elementary School. Mr. Robinette requested the transfer for personal reasons and was even willing to take a cut in salary. Tr. 419–420. He was a tenured principal and had applied for the transfer about six years before receiving it. Tr. 219–220.

26. James Ray Ross was the principal at John Sevier Elementary School just prior to the plaintiff's appointment to that job. He had served one year as principal at John Sevier when the plaintiff succeeded him. He next became principal at Heiskel Elementary and later, in February 1979, at Green Hill-Heiskel Elementary. Tr. 386. The latter school subsequently was renamed Copper Ridge Elementary School. Tr. 103. Mr. Ross had been a principal since 1975 and was tenured when he was appointed to the principalship at Copper Ridge in 1979.

27. D. James Monroe was transferred by the Board of Education from his position of principal at Powell High School to principal of Karns Middle School on July 11, 1979. Ex. 20. Karns Middle School housed grades 5 through 8 and had about 800 students. Tr. 394. At the time of the transfer, Mr. Hoffmeister had filed formal charges against Monroe arising out of an incident in which he allegedly was absent from the last day of the first session of summer school. Ultimately, the Board of Education reprimanded Mr. Monroe but declined to enforce the three-day suspension and loss of pay given by Mr. Hoffmeister.

Mr. Monroe had many years experience as a principal and had served primarily as a disciplinarian at Powell High.[10] He was a tenured principal. Mr. Hoffmeister was of the opinion that Monroe should be transferred to Karns Middle School for "public relations" reasons since a disciplinarian principal usually makes some enemies in the community. Tr. 210.

28. Ron Thomas was transferred by the Board of Education on August 13, 1980 from his position as administrative intern at Powell High School to the assistant principalship at Powell Middle School. Ex. 22. The plaintiff was not considered for this job because she had told Dr. Bedelle in July, 1980 that she was not interested in being "the disciplinarian" at any school. Tr. 284, 375–378, 436. Mr. Thomas was assigned to

---

10. In the defendants' middle and high schools, it is common practice for the assistant principal to concentrate on disciplinary matters and

for the principal to concentrate on curriculum matters or vice versa. Elementary schools are only assigned one principal.

Powell Middle School primarily to deal with student behavior and conduct. Tr. 282, 288, 290.

29. Paul Williams was transferred on July 11, 1979 by the Board of Education from his position as a teacher at Halls High School to the position of assistant principal at Halls Middle School. Halls Middle School was an on-going school and the defendants could have made reasonable accommodations for maternity leave if the plaintiff had been appointed to the position. Mr. Williams had no prior administrative experience. Tr. 230. He had taught at the high school level for 17 years and had never taught at the elementary school level. Tr. 262. At the time of his appointment, the plaintiff had just completed two successful years as principal at John Sevier and her supervisor, Mrs. Rhodes, had recommended her for another administrative position in the school system. Mr. Hoffmeister's reasons given at trial for selecting Mr. Williams instead of the plaintiff were rather vague, although it does appear that Mr. Williams' experience in "... working with this age group ..." (i. e., 6th, 7th and 8th grades) was one of the primary reasons given. Tr. 230, 233.

Dr. Bedelle testified that he suggested Mr. Williams' appointment inter alia because (1) he "was better equipped individually" to deal with conflicts that had arisen between the principal and staff and among the staff itself, (2) the plaintiff had no administrative experience in a large school, and (3) Mr. Williams had experience in teaching students in close proximity to the 6th, 7th and 8th grades. Tr. 403–405; see also Tr. 259–260, 401.

Although the plaintiff told Dr. Bedelle in July, 1980, that she was not interested in the job of a "disciplinary" assistant principal in a middle school, the defendants had no reason to believe that this was the case

when this appointment was made. The defendants did not contact or interview the plaintiff in connection with this vacancy. It was not until after the EEOC issued its findings favorable to plaintiff in 1980 that the defendants offered the plaintiff an assistant principalship at Doyle Middle School.[11]

30. Fred Nidiffer, Jr., was transferred by the Board of Education on August 1, 1979 from the assistant principalship at Cedar Bluff Middle School to the position of assistant principal at Karns Middle School. Karns had an enrollment of about 900 students. Tr. 423.

The plaintiff was considered for the Karns Middle School vacancy but Mr. Nidiffer was allegedly chosen because of his more direct experience with middle schools and the grades that comprise a middle school (grades 6, 7, and 8). Tr. 423, 434. Both the principal and assistant principal at Karns Middle School were new at the beginning of the 1979–1980 term. Tr. 424. Dr. Bedelle testified that "experience alone" would have been a determining factor in connection with this appointment. Id. Mr. Nidiffer's administrative experience in terms of time as of August 1979 was, however, less than that of the plaintiff. At that time his administrative experience was limited to the 1978–79 school year at Cedar Bluff Middle School. Tr. 285. His service as an "intern" during the 1977–78 year at that school was not considered as service in an administrative position by the defendants. Tr. 361. The position of administrative intern is a one-year assignment made for the purpose of evaluating the intern's "administrative abilities and potential." Ex. 37 (last page).

Mr. Nidiffer was appointed by the Board of Education to Cedar Bluff Intermediate School (grades 3, 4, and 5) in August, 1980 as a principal. Ex. 22. That position as

11. Mrs. Williams testified that she met with Dr. Bedelle in July, 1980, and that he told her that as a result of the EEOC investigation, the school system was "under order" to give her an administrative job. Tr. 69. He asked her if she would be interested in an assistant principalship at Doyle Middle School. She replied in the negative because it was a "discipline-type" job instead of a "curriculum-type" job. Tr. 75–76. There was no evidence that the defendants were under any such "order" to give the plaintiff an administrative position. Rather, a May 13, 1980, "Determination" letter triggered the meeting. Ex. 9.

well as his previous position were "curriculum" positions as opposed to "disciplinary" positions and were the types of jobs for which the plaintiff had been trained and in which she was interested. Tr. 425. Until his appointment to Cedar Bluff Intermediate, Mr. Nidiffer was not a tenured principal. Tr. 285–286. Cedar Bluff Intermediate had an enrollment of about 900 students. Tr. 72.

In July, 1980 the plaintiff met with Dr. Bedelle at his office and, among other things, the position of principal at Cedar Bluff Intermediate School was discussed. She asked him about the possibility of her being recommended for the job, and she testified that he replied as follows:

> No, ... I have already decided that Nidiffer will be the principal at Cedar Bluff Intermediate School. And again, I feel like I need a man over there and I feel like I need an experienced person and I feel like I need somebody who can handle the people in the community.

Tr. 71–72. It is not clear from the record what classroom teaching experience, if any, Mr. Nidiffer had. When Mr. Nidiffer was appointed to the position both he and the plaintiff had two years actual administrative experience but, of course, hers was with grades closer to grades 3, 4 and 5. She had served as a sole principal whereas he had not. It is true that Mr. Nidiffer had administrative experience at schools with larger enrollments, but this may be a distinction without a difference. When Dr. Bedelle was asked by his attorney if service in an administrative position in a small school prepared an administrator for the problems of a large school, he replied:

> To some extent, yes, it would in terms of the administrative requirements that are required of all schools. You would learn that. The bookkeeping procedure, the administrative policies of operating the school in terms of the use of the facility and the kinds of things that are common to all schools.
>
> In terms of preparing you to operate in a school of two or three times the number that you have been dealing with, there

would be some question depending a lot upon the community involved, on the background or history of the school that we are talking about and, too, depending upon the kind of exposure you have had with the personnel problems dealing with teachers in a small situation.

Tr. 301–302. He was equally vague on the question of administering schools with differing age groups. Tr. 304. Of course, females could not get administrative experience in middle schools with large enrollments without being appointed to administrative jobs in those schools. As mentioned earlier, there have been no female middle school principals and few female assistant principals for at least the past five years.

With reference to Dr. Bedelle's statement that Mr. Nidiffer was better qualified to "handle the people in the community," it should be remembered that in her evaluation of the plaintiff for the 1978–79 school year, Mrs. Rhodes stated that the plaintiff worked "extremely well" with the community and that she was "greatly appreciated by John Sevier parents." Ex. 6.

Cedar Bluff Intermediate was an open classroom facility. Mr. Nidiffer was experienced with such a facility because of his terms of service at the middle school in 1977–78 and 1978–79. Tr. 433. Mrs. Williams taught at Ritta School for 3 years (1973–1976) in the school system and she taught open classrooms for two years of those three years. Tr. 24. She was therefore just as experienced as Mr. Nidiffer, if not more, with the open-classroom concept.

31. Other than the state certification requirements and some very general written guidelines, see e. g. Ex. 13, § 4005.06 and Ex. 25, there are few objective guidelines for the selection of principals and assistant principals in the school system. It is evident that a great deal of the selection process depends on subjective criteria. For example, when Mr. Hoffmeister was asked why he had not appointed the plaintiff to any of the vacancies in question, he replied:

> Because the jobs that I had that were open I felt like she was not the right person for those particular jobs. Had a

job come along that I felt like she would have been able to be comfortable in and could do a good job, then I certainly would have recommended her for it.

Tr. 234.

It is also evident that the single most important factor in the filling of vacancies in the school system is the superintendent's recommendation to the Board of Education. Tr. 334.

32. The defendants prepared a summary of certain appointments made between August 6, 1975 and August 13, 1980. Ex. 38. They contend that 8 of the 10 appointments from the position of *teacher* to the position of principal or supervisor were made to females during this period of time. This may well be true. However, it should be noted that only four of the appointments of females were to principalships and all of these appointments were to elementary school principalships. During this same period of time, the defendants' records show that seven males were appointed as principals or assistant principals at middle schools while no females were appointed to middle school·principalships and only one female was appointed to an assistant principalship at a middle school. Nine men were appointed to elementary school principalships and five women were appointed to such positions. *See* Ex. 37.

## II. *Conclusions of Law*

1. This is a "disparate treatment" case because the plaintiff contends that she was treated less favorably than others similarly situated on account of her sex and race. Hence, ". . . [p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 1854–1855 n. 15, 52 L.Ed.2d 396 (1977). "Where a Title VII case is brought under the disparate treatment theory, the plaintiff must prove discriminatory intent." *Grano v. The Department of Development of the City of Columbus*, 637 F.2d 1073, 1081 (6th Cir. 1980). ". . . [P]roving that an employer refused to hire or promote because of a person's

race or sex is difficult. . . . Because discriminatory intent is so difficult to prove by direct evidence, it is incumbent on a sensitive decisionmaker to analyze all of the surrounding facts and circumstances to see if discriminatory intent can be reasonably inferred." *Id.* at 1081 n. 7 (citation omitted).

■ 2. The plaintiff established a prima facie case of sex discrimination with regard to the appointments of the following white males: Bill Thomas, Lewis P. Robinette, James Ray Ross, D. James Monroe, Ron Thomas, Paul Williams and Fred W. Nidiffer, Jr. She did so by establishing the following with respect to each of the vacancies filled by these men: (1) she belongs to a minority group, (2) she applied for and was qualified for each vacancy, (3) she was rejected despite her qualifications, and (4) after her rejection, the job remained open and the defendants continued to seek applicants from persons with her qualifications. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ 3. The defendants were therefore required to come forward and articulate a nondiscriminatory reason why they failed to appoint the plaintiff to each of these vacancies. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The defendants met this limited burden in the instant case by articulating such reasons in a reasonably clear manner. *Id.* 450 U.S. at 253, 101 S.Ct. at 1094–95. Admissible evidence was produced by the defendants ". . . which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* 450 U.S. at 257, 101 S.Ct. at 1096; *Grano v. Dept. of Development, Etc., supra*, 637 F.2d at 1080.

■ 4. Since her prima facie case was rebutted, the plaintiff, in order to prevail, therefore was required to show by a preponderance of the evidence that the reasons given by the defendants were pretextual and that she was therefore the victim of

intentional discrimination. She can succeed in doing this directly if she shows "... that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095. Important to this determination would be any evidence of non-uniform or unequal application of criteria for selecting minorities for promotion as compared to non-minorities, the treatment the plaintiff received during her term of employment, the defendants' reactions, if any, to the plaintiff's legitimate civil rights activities, and the defendants' general policy and practice with respect to minority employment. *See McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–805, 93 S.Ct. at 1817. With regard to the last factor, statistics may be helpful in determining whether or not the defendants' refusal to appoint the plaintiff to the vacancies in question conformed to a general policy of discrimination against minorities. *See id.*

■ 5. Title VII does not require an employer to hire or promote a minority applicant whenever that person's objective qualifications are equal to those of a white male applicant. "Rather, the employer has discretion to choose among equally qualified candidates provided that decision is not based on unlawful criteria." *Texas Dept. of Community Affairs v. Burdine, supra,* 450 U.S. at 259, 101 S.Ct. at 1097.

> While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve. Nor is an employer required to adopt the policy that will maximize the number of minorities, women, or older persons in his workforce. See *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576–577, 98 S.Ct. 2943 [2949] 57

L.Ed.2d 957 (1978). An employer is entitled to make his own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who will be even better, as long as this is not a pretext for discrimination. The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one. The jury must understand that its focus is to be on the employer's motivation, however, and not on its business judgment. See *NLRB v. Eastern Smelting & Refining Corp.,* 598 F.2d 666, 670 (1st Cir. 1979).

*Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979). However, where the number of minorities in the relevant work force is non-existent or, at best, nominal, an employer's assertion that a minority applicant was not qualified must be closely scrutinized. *Kinsey v. First Regional Securities, Inc.,* 557 F.2d 830, 838 (D.C.Cir.1977); *United States v. N. L. Industries, Inc.,* 479 F.2d 354, 370–371 (8th Cir. 1973), rehearing and rehearing en banc denied, *id.*

■ 6. Also, where, as here, subjective standards play a major role in the selection of applicants for vacancies, those subjective standards must also be closely scrutinized. *See Senter v. General Motors Corp.,* 532 F.2d 511, 528–530 (6th Cir.) *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Rowe v. General Motors Corporation,* 457 F.2d 348, 358–359 (5th Cir. 1972); *Saracini v. Missouri Pac. R. Co.,* 431 F.Supp. 389, 393 (D.C.Ark.1977). This is not to intimate that the use of subjective standards is wrong when employment decisions of this type are made. Undoubtedly a sensitive and important decision like that of placing an assistant principal or principal in a given school will entail some subjective decision-making on the appointing official's part. Where subjective standards are utilized, however, such standards "... must be non-discriminatory, and related to job performance, and the applicant must be made

aware of them in advance." *Saracini v. Missouri Pac. R. Co., supra,* 431 F.Supp. at 394. The danger inherent in the use of subjective standards is clear. Such use ". . . allows the person conducting the analysis to inject his own impermissible biases, whether intentionally or unintentionally, into the determination of the applicant's qualifications." *Id.*

Courts are ill-equipped to evaluate the qualifications of those in the teaching profession. "But where allegedly superior qualifications are set up as, the reason for . . . refusal to hire [or promote] the court does have the right to insist . . . that fair consideration be given to the qualifications of the female applicant." *United States v. Wattsburg Area School Dist.,* 429 F.Supp. 1370, 1377–1378 (D.C.Pa.1977).

Often the plaintiff would receive no official notification of vacancies and the decisions were made without giving her the opportunity to interview for the jobs. There did not seem to be any systematic method of reviewing the qualifications of all of the applicants, including the plaintiff's, for the vacancies in question.

■ When an employer, in the best of faith, merely weighs each person's talents and then chooses a male over a female (or vice versa) there is no violation of Title VII. "But the inquiry does not necessarily stop there. Courts must be extremely careful to determine that the reasons given for selecting a male applicant over a female applicant are simply not a ruse disguising true discrimination." *Pond v. Braniff Airways, Inc.,* 500 F.2d 161, 165–166 (5th Cir. 1974).

■ 7. The defendants' failure to appoint the plaintiff as a principal or assistant principal is consistent with Mr. Hoffmeister's remark to her in July, 1977 that ". . . we like to promote our men . . ." to such positions. The defendants' failure to promote the plaintiff as a middle school principal is consistent with the statistics showing that no females have occupied such jobs within the past five years despite the fact that applications have been made. It is also consistent with Mr. Hoffmeister's remarks to the plaintiff on July 2, 1979, that he ". . . felt like women would make better administrators, but they do have to work hard . . ." but ". . . that a lot of times you just need a . . . [male administrator], children need a male image. . . ." [12]

■ 8. Although the statistics, standing alone, might support an inference that the defendants discriminated against Mrs. Williams because of her sex, *Saracini v. Missouri Pac. R. Co., supra,* 431 F.Supp. at 392, there is direct evidence that a discriminatory reason more likely motivated the defendants. This evidence consisted of the statements made to the plaintiff by Mr. Hoffmeister quoted just above as well as the overall lack of reasonableness of the justifications given by the defendants in connection with at least three of the appointments. The latter evidence will be discussed, *infra.* The reasonableness of the proffered justifications are probative of whether or not they are pretexts. *Loeb v. Textron, Inc., supra,* 600 F.2d at 1012 n. 6.

■ 9. The plaintiff proved by a preponderance of the evidence that the defendants' reasons for not promoting her to at least three of the vacancies were pretextual in nature.

Paul Williams had no administrative experience when he was assigned as assistant principal at Halls Middle School in July, 1979. He had 17 years' experience as a high school teacher but none as an elementary or middle school teacher. On the other

---

12. Female principals are almost exclusively assigned to elementary schools. No females have been middle school principals during the past five years and very few assistant principals are females. From these facts and Mr. Hoffmeister's remarks it might well be inferred that the defendants believe that a "male image" is often a necessary requisite for a middle or secondary school principal or assistant principal. If this is the case, it was incumbent upon the defendants to come forth and show that such was a "bona fide occupational qualification." This defense was not raised, however. Therefore, applicants for principalships at the middle and secondary level were entitled to be treated as any other applicant without any regard whatsoever to sex. *Gillin v. Federal Paper Board Co., Inc.,* 479 F.2d 97, 101 (2d Cir. 1973).

hand, the plaintiff had, at that time, two years of successful experience as an elementary school principal.

The justifications given by the defendants are suspect. Mr. Williams was supposedly better able to deal with conflicts that had arisen between the former principal and the staff and among the teachers themselves. Yet, the plaintiff's written evaluations made while she was a principal showed clearly that she had done a good job of uniting the John Sevier staff. The defendants had no objective basis for knowing how Mr. Williams would perform as an administrator in uniting the Halls Middle School staff. The defendants also raised the justification that the plaintiff had no experience administering a large school consisting of 6th, 7th and 8th grades. Neither had Mr. Williams. The plaintiff had taught at Ritta Elementary School at a time when it housed grades K through 8. Although the defendants contended that Mr. Williams had "more experience working with" the age group at the 6th, 7th and 8th grade levels, there is no evidence that he had taught those grades. Mrs. Williams had teaching and administrative experience at the levels of grades 1 through 5.

The defendants also indicated that Mr. Williams was better equipped to deal with curriculum and discipline problems at the school. There was no evidence, however, that the plaintiff could not have dealt with such problems on an equally effective basis. Her area of expertise and interest was in the curriculum area and the job was basically a "curriculum job." She had successfully handled both curriculum and discipline at John Sevier.

Significantly, the plaintiff was not advised of this vacancy despite the Board of Education's written policy concerning notification to personnel of possible promotional opportunities. At the time of this appointment, the plaintiff had not told the defendants that she preferred not to be appointed to the position of assistant principal at a middle school. Additionally, in July, 1980, when she did tell Dr. Bedelle this, she qualified this restriction by telling him that if she could have input into the curriculum at a middle school, she would be interested in an assistant principalship. Tr. 75. The position at Halls Middle School was just such a position.

It is obvious that Dr. Bedelle believed that the plaintiff was capable of fulfilling the role of a "disciplinarian" assistant principal at a middle school prior to his July, 1980, meeting with the plaintiff since he offered her such a job at Doyle Middle School. This casts serious doubt on the legitimacy of the justification defendants gave at trial for denying her several administrative positions prior to July, 1980, i. e. that a disciplinarian was needed. Additionally, offering her the job at Doyle Middle School casts doubt on the legitimacy of two other justifications offered by the defendants at trial in connection with appointments prior to July, 1980, to-wit: her lack of administrative experience at larger schools and her lack of administrative experience with the 6th, 7th and 8th grades.

10. In August, 1979, when Fred Nidiffer, Jr. was appointed as assistant principal at Karns Middle School, his administrative experience was limited to one year as assistant principal at Cedar Bluff Middle School. When Mrs. Williams was appointed as principal at John Sevier in 1977, Mr. Nidiffer was an intern at Cedar Bluff Middle School. This was not considered an administrative position.

In August, 1979, Mrs. Williams had two years of successful experience as an elementary school principal.

█ It is true that in August, 1979, Mr. Nidiffer had more direct experience with administering the middle school grades (6, 7 and 8). This justification was offered in connection with several of the appointments in question. Refusing to appoint the plaintiff on this ground, however, had the impermissible effect of freezing the status quo of an historical preference for male administrators at this level. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 429–430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The proffered justification itself had a discriminatory impact on females. As previously indi-

cated, all female principals serving during the past five years were elementary school principals, except one. Furthermore, the great majority of assistant principals were males. Hence, no females were able to get experience administering the 6th, 7th and 8th grades while serving as middle school principals and few were able to get such experience while serving as assistant principals.

Mrs. Williams was not notified of the Karns vacancy despite the fact that the defendants knew that she was interested in it and despite the fact that it was a "curriculum job," for which she was trained.

11. Mr. Nidiffer was appointed to the principalship at Cedar Bluff Intermediate in August, 1980. He was not a tenured principal until the time of that appointment. Cedar Bluff Intermediate consisted of grades 3, 4 and 5 and, of course, Mrs. Williams had two years of experience as principal of a school consisting of grades K through 6 as well as considerable experience teaching in grades 3, 4 and 5. Mr. Nidiffer had no such experience. The job was a "curriculum job" in which she was interested. Mrs. Williams got no serious consideration for the job, and when she approached Dr. Bedelle about the vacancy he told her in effect that his mind was made up and that he "... needed a man over there...."

12. Based on the foregoing, the undersigned finds and concludes that the defendants intentionally discriminated against the plaintiff on account of her sex in connection with the July, 1979 vacancy at Halls Middle School, the August, 1979 vacancy at Karns Middle School and the August, 1980 vacancy at Cedar Bluff Intermediate School.

13. Since the relief which the plaintiff seeks and to which she is entitled can be afforded to her under Title VII, there is no apparent reason to consider her claims under 42 U.S.C. §§ 1981 and 1983 in this report.

14. It is the purpose of Title VII "... to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The plaintiff can be made whole if she is appointed promptly to a position of principal, assistant principal or supervisor for which she is qualified within the school system with appropriate benefits, seniority and tenure status which such appointment would have afforded her had she been continuously employed from July 11, 1979. 42 U.S.C. § 2000e–5(g). See generally, Annot., 38 A.L.R.Fed. 27, 58–66 (1978).

15. The plaintiff's back pay claim was dismissed at the conclusion of her case in chief. She did not prove with any degree of certainty the amount of back pay to which she believed she was entitled. Although a principal's pay is based, in part, on the student enrollment at the school at which he or she serves, there was no reason that the plaintiff could not have established back pay claims with respect to each of the positions which were denied her as the result of alleged discrimination.

Additionally, she could have mitigated any back pay "damages" by accepting the assistant principalship at Doyle Middle School when Dr. Bedelle offered it to her in July, 1980. She turned the position down because of personal preference and not because she was not qualified to take it. The plaintiff's refusal to take the job offered her was prejudicial to the defendants insofar as her subsequent back pay claim is concerned. Under all of the circumstances, an award of back pay would be inappropriate. *See Albemarle Paper Co. v. Moody*, *supra*, 422 U.S. at 424, 95 S.Ct. at 2375.

### III. *Recommendations*

For the reasons indicated above, the following recommendations are made:

(a) that judgment enter in accordance with the foregoing; and

(b) that this matter be recommitted to the undersigned for a hearing, if necessary, and for a report and recommendation on the amount of reasonable attorney's fees due the plaintiff.